UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION


RONALD KEITH ABBOTT,

                   Petitioner,

v.                                    CASE NO. 04-CV-72008-DT

TOM BELL,                    PAUL D. BORMAN
                                    UNITED STATES DISTRICT JUDGE

                    Respondent.
_____/

## OPINION AND ORDER DENYING HABEAS CORPUS PETITION AND DENYING A CERTIFICATE OF APPEALABILITY

Petitioner Ronald Keith Abbott has applied for the writ of habeas corpus under 28 U.S.C.
§ 2254. The habeas petition attacks Petitioner's state convictions for first-degree murder and
assault with intent to do great bodily harm less than murder. Respondent urges the Court to deny
the habeas petition. The Court has concluded for reasons given below that Petitioner's claims
are procedurally defaulted or without merit. Accordingly, the habeas petition will be denied.

### I. Background

Petitioner was tried before a circuit court jury in Genesee County, Michigan. On July 13,
2001, the jury found him guilty of first-degree (premeditated) murder, MICH. COMP. LAWS §
750.316(1)(a), and assault with intent to commit great bodily harm less than murder, MICH.
COMP. LAWS § 750.84. The trial court sentenced Petitioner to life imprisonment for the murder
conviction and to a concurrent sentence of 114 to 240 months for the assault conviction. The
facts leading to the convictions and sentence have been summarized by the Michigan Court of
Appeals as follows:

Defendant was convicted of brutally murdering his girlfriend, Denise Goddard, and assaulting her friend, Jaynne Reagor, during the early morning of December 20, 2000. Ms. Reagor testified that Ms. Goddard came over to her house twice that morning. She stated that Ms. Goddard was acting nervous and asked to use the phone. When Ms. Goddard returned the second time that morning the two spoke outside the house. At that time, Ms. Reagor observed defendant walk up to the house and begin to argue with Ms. Goddard. When Ms. Reagor attempted to intercede, defendant hit Ms. Reagor twice in the back of the head. As a result, Ms. Goddard fell against the chimney, hit the storm door of her house, and then fell to the ground. Ms. Reagor recalled that Ms. Goddard went inside the house when this assault occurred and that defendant followed her yelling, "I'm going to prison now. You're dead bitch." Ms. Reagor then heard breaking glass and yelling from inside the house. She further testified that when defendant finally exited the house, he stepped over her body and walked away. After defendant left, Ms. Reagor crawled back into the house and waited until help arrived.

When the police responded to the scene they discovered Ms. Reagor, who was semiconscious, in the kitchen and the body of Ms. Goddard in the living room. Ms. Goddard was dead. The house was strewn with broken glass, overturned furniture and blood. Several knives, dinner forks and scissors were also found throughout the house with blood and hair on them. There was also a broken cement statute located by Ms. Goddard's head with blood on it. One police officer likened the scene to something out of the movie *Helter Skelter*. Ms. Reagor was ultimately taken to the hospital. A portion of her ear was missing and she was also treated for a head injury. An autopsy report later revealed that Ms. Goddard suffered a total of seventy-five wounds, forty-four of which were stab wounds from various objects and blunt force trauma to her head.

*People v. Abbott*, No. 237084, at 1-2 (Mich. Ct. App. Sept. 25, 2003).

Petitioner raised his habeas claims in an appeal of right filed through counsel. The

Michigan Court of Appeals affirmed his convictions, *see id.,* and on March 30, 2004, the

Michigan Supreme Court denied leave to appeal. *People v. Abbott*, 469 Mich. 1026; 679

N.W.2d 58 (2004) (table).

The habeas corpus petition is dated May 21, 2004. The grounds for relief read:

I.      Petitioner was denied Due Process of Law where the evidence
        presented at trial was insufficient as to the element of
        premeditation and deliberation to support the jury's verdict of

2

murder in the first degree.

II.      Petitioner's conviction of assault with intent to do great bodily harm less than murder must be reversed where the prosecution failed to present sufficient evidence of intent to do great bodily harm to satisfy the Due Process standard of guilt beyond a reasonable doubt.

III.     The trial court violated appellant's Due Process rights by admitting appellant's alleged custodial statement to a parole officer where the officer questioned appellant without first giving appellant *Miranda* warnings.

IV.     Appellant was denied a fair trial where he was required to appear before his jury in manacles and leg shackles, despite the fact that he had no history of escape or violence.

V.     The prosecutor violated Appellant's state and federal constitutional Due Process rights to a fair trial by engaging in repeated instances of misconduct.

VI.    The cumulative effect of these errors rendered Appellant's trial fundamentally unfair.

Respondent argues in a responsive pleading that Petitioner's fourth and fifth claims are procedurally defaulted and that the state court's adjudication of Petitioner's other claims was objectively reasonable.

## II.  Standard of Review

Petitioner is entitled to the writ of habeas corpus only if he can show that the state court's adjudication of his claims on the merits–

(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

A state court's decision is "contrary to" clearly established federal law "if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts." *Williams v. Taylor*, 529 U.S. 362, 412-13 (2000). A state court's decision is an "unreasonable application of" clearly established federal law "if the state court identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." *Id*. at 413. "Avoiding these pitfalls does not require citation of [Supreme Court] cases – indeed, it does not even require *awareness* of [Supreme Court] cases, so long as neither the reasoning nor the result of the state-court decision contradicts them." *Early v. Packer*, 537 U.S. 3, 8 (2002) (*per curiam* opinion) (emphasis in original).

> Furthermore, state findings of fact are presumed to be correct unless the defendant can rebut the presumption by clear and convincing evidence. 28 U.S.C. § 2254(e)(1). Finally, review is conducted in light of the law as it existed at the time of the final state court decision, *Teague v. Lane,* 489 U.S. 288 (1989), unless an intervening constitutional decision announces a "watershed" rule of criminal law with implications for the fundamental fairness of the trial proceeding. *Caspari v. Bohlen,* 510 U.S. 383, 396 (1994).

*Baze v. Parker*, 371 F.3d 310, 318 (6th Cir. 2004), *cert. denied*, __ U.S. __, 125 S. Ct. 1670 (2005).

### III.  Discussion

### A.  Sufficiency of the Evidence

Habeas claims I and II allege that the evidence presented at trial was insufficient to sustain Petitioner's convictions. Specifically, Petitioner alleges that there was insufficient evidence of premeditation and deliberation to support his murder conviction and insufficient

4

evidence of intent to do great bodily harm to support the assault conviction.

The "Due Process Clause protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged." *In re Winship*, 397 U.S. 358, 364 (1970).  After *Winship*, the critical inquiry on review of the sufficiency of the evidence to support a criminal conviction is

> whether the record evidence could reasonably support a finding of guilt beyond a reasonable doubt. [T]his inquiry does not require a court to "ask itself whether *it* believes that the evidence at the trial established guilt beyond a reasonable doubt." *Woodby v. INS*, 385 U.S. [276, 282 (1966)] (emphasis added).  Instead, the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.  *See Johnson v. Louisiana*, 406 U.S. [356, 362 (1972)].  This familiar standard gives full play to the responsibility of the trier of fact fairly to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts.

*Jackson v. Virginia*, 443 U.S. 307, 318-19 (1979) (footnote omitted) (emphasis in original).

*Jackson* "must be applied with explicit reference to the substantive elements of the criminal offense as defined by state law." *Id*. at 324 n.16.  "[C]ircumstantial evidence alone is sufficient to sustain a conviction and such evidence need not 'remove every reasonable hypothesis except that of guilt.'" *United States v. Ellzey*, 874 F.2d 324, 328 (6th Cir. 1989) (quoting *United States v. Stone*, 748 F.2d 361, 363 (6th Cir. 1984)).

### 1. The Murder Conviction

Petitioner alleges that none of the elements for first-degree murder were satisfied. According to him, the evidence established that he had consumed large quantities of alcohol and cocaine before the incident and that he "blew up."  He maintains that there was no planned course of conduct by which he could have measured or evaluated the consequences of his

actions.

Jurors in Michigan "can convict [a defendant] of murder only when they are convinced beyond a reasonable doubt that (1) the defendant intended (actually or impliedly) to kill and (2) circumstances of justification, excuse or mitigation do not exist." *People v. Morrin*, 31 Mich. App. 301, 323; 187 N.W.2d 434, 445 (1971). First-degree murder requires a finding that the defendant committed a homicide with premeditation and deliberation. *Id.*, 31 Mich. App. at 328; 187 N.W.2d at 448-49.

> To premeditate is to think about beforehand; to deliberate is to measure and evaluate the major facets of a choice or problem. As a number of courts have pointed out, premeditation and deliberation characterize a thought process undisturbed by hot blood. While the minimum time necessary to exercise this process is incapable of exact determination, the interval between initial thought and ultimate action should be long enough to afford a reasonable man time to subject the nature of his response to a "second look."

*Id.* 31 Mich. App. at 329-30; 187 N.W.2d at 449 (footnotes omitted).

Premeditation and deliberation may be proved by circumstantial evidence. *People v. Herndon*, 246 Mich. App. 371, 415; 633 N.W.2d 376, 404 (2001). Factors to be considered when determining whether the defendant premeditated and deliberated a murder are: "(1) the previous relationship between the defendant and the victim; (2) the defendant's actions before and after the crime; and (3) the circumstances of the killing itself, including the weapon used and the location of the wounds inflicted." *People v. Plummer*, 229 Mich. App. 293, 300; 581 N.W.2d 753, 757 (1998).

Voluntary manslaughter is distinguished from murder by the absence of malice. *People v. Townes*, 391 Mich. 578, 589; 218 N.W.2d 136, 140 (1974).

> To reduce a homicide to voluntary manslaughter the factfinder must determine from an examination of all of the circumstances surrounding the killing that

6

malice was negated by provocation and the homicide committed in the heat of passion.[1]  *People v. Scott*, 6 Mich. 287, 295 (1859).  Justice Christiancy defined voluntary manslaughter in the early case of *Maher v. People*, 10 Mich. 212, 219-220 (1862):

> But if the act of killing, though intentional, be committed under the influence of passion or in heat of blood, produced by an adequate or reasonable provocation, and before a reasonable time has elapsed for the blood to cool and reason to resume its habitual control, and is the result of the temporary excitement, by which the control of reason was disturbed rather than of any wickedness of heart or cruelty or recklessness of disposition; then the law, out of indulgence to the frailty of human nature, or rather, in recognition of the laws upon which human nature is constituted, very properly regards the offense as of a less heinous character than murder, and gives it the designation of manslaughter.
>
> A defendant properly convicted of voluntary manslaughter is a person who has acted out of a temporary excitement induced by an adequate provocation and not from the deliberation and reflection that marks the crime of murder.

*Id.,* 391 Mich. at 589-90; 218 N.W.2d at 140-41 (footnote in original) (end citations omitted).

### a.  The Facts

Defense counsel maintained at trial that the evidence supported a conviction of voluntary manslaughter, not murder, because Petitioner acted in the heat of passion.  (Tr. July 11, 2001, at 38-43 .)  Counsel argued that Petitioner had been powerless to control his emotions and reasoning  because he suspected Denise Goddard was using cocaine and that she would never regain custody of their child.  (Tr. July 12, 2001, at 116 -25.)

The Michigan Court of Appeals summarized the evidence as follows:

---

[1]  The word "passion" in the context of voluntary manslaughter describes a state of mind incapable of cool reflection.  A defendant acting out of a state of terror, for example, is considered to have acted in the "heat of passion."  *Commonwealth v. Colandro*, 231 Pa. 343, 80 A. 571 (1911); *Austin v. United States*, 127 U.S. App. D.C. 180, 188, 382 F.2d 129, 137 (1967).

Defendant and Ms. Goddard had an argumentative and sometimes volatile history. Indeed, there was testimony that defendant struck Ms. Goddard in the past and threatened to kill her. On the night in question, the evidence shows that defendant was looking for Ms. Goddard. There was also testimony that Ms. Goddard was nervous and afraid that defendant was angry with her.

        More compelling, however, is the fact that defendant *walked* over to Ms. Reagor's residence and actually announced his intent to kill Ms. Goddard. He announced this intention after assaulting Ms. Reagor and proceeded to follow Ms. Goddard into the house. Further proof that defendant premeditated and deliberated his actions lies in the forty-four stab wounds he inflicted on Ms. Goddard, the vast majority of which were located on her upper body. These wounds were caused by various instruments, including dinner forks, scissors, and knives. He also struck Ms. Goddard in the head with a cement statute. Additionally, there were abrasions discovered on Ms. Goddard's arms and hands that testimony established indicated that she was in a defensive position.

*Abbott*, Mich. Ct. App. No. 237084, at 3 (footnote omitted) (emphasis in original).

The court of appeals determined that "[t]he nature of the killing and the evidence of Ms. Goddard's defensive posture provide support for a finding that defendant had time to take a 'second look.'" *Id*. The court of appeals concluded that Petitioner's claim had no merit because there was overwhelming evidence to support the murder conviction.

### b. Analysis

The state court's findings are supported by the record. Jaynne Reagor testified that, on the night in question, Petitioner came over to her house and began arguing with Denise Goddard outside her side door. Petitioner hit Ms. Reagor while she was standing outside her house and after Ms. Goddard had gone in the house. Petitioner then turned and went in the house, saying, "I'm going to prison now. You're dead, bitch." Ms. Reagor subsequently heard glass breaking and Petitioner and Goddard screaming at each other. Petitioner exited the house a few minutes after the screaming and other noises stopped. (Tr. July 11, 2001, at 84-91.)

Dr. Rachiel Land testified that Denise Goddard had seventy-five wounds, forty-four of

8

which were stab wounds.  Thirty-seven stab wounds were visible on Ms. Goddard's chest, neck, and breast.  Six stabs punctured the right lung and two stabs punctured the left lung.  Goddard's skull was fractured due to blunt force trauma to the head.  (*Id*. at 128-50.)  Vickie Sue Ashbaker testified that Petitioner had hit Denise Goddard and threatened to kill Ms. Goddard in the past if she did not stop using drugs.  (*Id*. at 162-64, 170, and 177.)

Sergeant Deborah Bayer testified that furniture had been overturned, there was blood on the walls, and glass was everywhere.  Sergeant Bayer saw a broken cement statue by Denise Goddard's head.  Forks, knives, and scissors had blood or hair on them.  (Tr. July 12, 2001, at 37-38, 54, and 62-63.)

After his arrest, Petitioner told his parole agent, Mary Lou Anderson, that he had "lost it" and "killed her."  (*Id*. at 64-65.)  He told a cell mate (Marc McCarty) that, on the night of the killing, he went in search of Ms. Goddard after he arrived home and discovered that she was not there.  When he determined where she was, he went to the house to walk her home.  He and Ms. Goddard then got in a big fight.  He was upset because Ms. Goddard was not home when he got there and because she had gone to the home of an ex-boyfriend's relative.  After the fight, he went home and changed his clothes.  He surrendered to the police when they arrived, but the police did not get his clothes.  (*Id*. at 69-75.)

The only testimony concerning drugs and alcohol occurred on cross-examination of Mr. McCarty by defense counsel.  McCarty testified that he informed Sergeant Scott Eddy that Petitioner had said he "just blew up" and that "it wasn't him" because he was drunk and on drugs (cocaine).  (*Id*. at 78-80.)

In summary, Petitioner's past relationship with Denise Goodard included threats to kill

9

her.  On the night in question, he walked over to see her, and he announced his intent to kill her as he entered the house.  He arguably weighed the consequences of his choice by acknowledging that he was going to prison for what he was about to do.  After the killing, he apparently tried to cover up his actions by changing his clothes and disposing of the clothes he was wearing during the altercation.  He used knives, forks, scissors, and a cement statue to assault Ms. Goddard.

A rational trier of fact could have concluded from all the facts that Petitioner premeditated and deliberated the killing and that there were no circumstances justifying his actions.  Therefore, the state court's conclusion that Petitioner's sufficiency-of-the-evidence claim had no merit was not an unreasonable application of *Jackson*.[2]

### 2.  The Assault Conviction

Petitioner alleges that there was no evidence of a specific intent to assault Jaynne Reagor. According to him the evidence did show that:  (1) he was under the influence of cocaine and alcohol; (3) he arrived unannounced and unarmed; (3) he was arguing with Denise Goddard when Jaynne Reagor intervened; and (4) he did not subject his actions to any determinative or contemplative thought.

The elements of assault with intent to commit great bodily harm less than murder are "(1) an attempt or threat with force or violence to do corporal harm to another (an assault), and (2) an intent to do great bodily harm less than murder."  *People v. Parcha*, 227 Mich. App. 236, 239; 575 N.W.2d 316, 318 (1997).  The defendant's state of mind can be inferred from the facts and circumstances, *People v. Beaudin*, 417 Mich. 570, 575; 339 N.W.2d 461, 463 (1983), including

---

[2]  Although the state court did not cite *Jackson* in its opinion, it used the same standard as articulated in *People v. Hunter*, 466 Mich. 1, 6; 643 N.W.2d 218, 221 (2002).

threats of harm the defendant made to the victim, *People v. Harrington*, 194 Mich. App. 424,

430; 487 N.W.2d 479, 483 (1992), and the means employed, *People v. Cunningham*, 21 Mich.

App. 381, 384; 175 N.W.2d 781, 782 (1970).

The Michigan Court of Appeals summarized the evidence supporting the assault

conviction as follows:

> Defendant struck Ms. Reagor twice in the head when she attempted to intervene
> in his argument with Ms. Goddard.  As a result, Ms. Reagor fell against a
> chimney and then against the storm door, before falling to the ground.  She
> claimed that she was unable to stand after the incident and had to crawl into the
> house.  Ms. Reagor lost a portion of one ear and suffered a head injury as a result
> of the assault.  Notably, when defendant left he stepped over Ms. Reagor's body,
> leaving her bleeding outside in the cold.

*Abbott*, Mich. Ct. App. No. 237084, at 4.

These findings of fact are supported by the testimony at trial.  *See* Tr. July 11, 2001, at

84-88, 92-93, 98, 117-18, and 123 (Jaynne Reagor's testimony); Tr. July 12, 2001, at 15 (Police

Officer Joseph Lechota's testimony); *id*. at 29 (paramedic Wayne Lynch's testimony); and *id*. at

51-52 (Sergeant Deborah Bayer's testimony.)  A rational trier of fact could have concluded from

the facts, taken in the light most favorable to the prosecution, that Petitioner attempted to harm

Ms. Reagor and, at the time, he possessed an intent to do great bodily harm less than murder.

Defendant's act of striking Ms. Reagor in the head so violently that she lost part of her ear, was

unable to stand up afterward, and suffered a head injury was indicative of intent to commit great

bodily harm.

The state court believed a rational finder of fact could conclude that Petitioner assaulted

Ms. Reagor with the requisite intent.   This conclusion was reasonable.  Petitioner, therefore, has

no right to relief on the basis of his second claim.

### B.  Petitioner's Statement

The third habeas claim alleges that the trial court violated Petitioner's right to due process  by admitting Petitioner's statement to Mary Lou Anderson, a state parole officer. Petitioner asserts that Ms. Anderson was an agent of the State, that he was in custody when he made his statement to her, and that the officer did not read the rights enumerated in *Miranda v. Arizona*, 384 U.S. 436 (1966), to him before he made his incriminating remarks.

Petitioner moved to suppress his statement to Ms. Anderson before trial.  The trial court held an evidentiary hearing at which Ms. Anderson testified that she went to the county jail on December 27, 2000, to serve Petitioner with parole violation charges.  She claimed that, when Petitioner approached her and came within talking distance, she said something like, "I don't believe this.  Then, again, maybe I do because of your anger."  Petitioner responded by saying, "I just lost it.  I did it.  I killed her."  (Tr. June 20, 2001, at 4-7, 10.)

The trial court denied Petitioner's motion to suppress his comments to Ms. Anderson after concluding that Anderson's statements did not amount to a question or accusation and that Petitioner's statement was volunteered and spontaneous.  (*Id*. at 23-25.)  The Michigan Court of Appeals subsequently concluded that *Miranda* warnings were not required because Petitioner's comments were volunteered and not made pursuant to questioning intended to elicit an incriminating response.

The Fifth Amendment provides that "[n]o person shall be . . . compelled in any criminal case to be a witness against himself. . . ."  U. S. CONST. amend. V.  To protect a suspect's Fifth

12

Amendment right to remain silent, an individual who

> is taken into custody or otherwise deprived of his freedom by the authorities in any significant way and is subjected to questioning . . . must be warned prior to any questioning that he has the right to remain silent, that anything he says can be used against him in a court of law, that he has the right to the presence of an attorney, and that if he cannot afford an attorney one will be appointed for him prior to any questioning if he so desires.

*Miranda*, 384 U.S. at 478-79.

The record indicates that Petitioner was in custody at the time his parole officer approached him and that the officer initiated the conversation. The Court finds it unnecessary to decide whether the parole officer's comments constituted interrogation within the meaning of *Miranda*, because the Supreme Court apparently has never held that a suspect's statements to his parole officer should be suppressed in the absence of *Miranda* warnings. The question arose in *Ohio v. Gallagher*, 425 U.S. 257 (1976) (per curiam opinion), but the Supreme Court remanded that case to permit the state court to explicate whether its judgment relied on federal law. The Supreme Court intimated no view on the merits of the Fifth and Fourteenth Amendment issue presented, and this Court has found no subsequent decision in which the Supreme Court addressed the constitutional issue. Thus, it cannot be said that the state court's decision in Petitioner's case was contrary to any Supreme Court decision.

Even assuming that the parole officer was required to read Petitioner's constitutional rights to him, the alleged constitutional error was harmless. *See Arizona v. Fulminante*, 499 U.S. 279, 308 (1991) (holding that an involuntary confession is subject to harmless-error analysis). Petitioner did not deny killing Denise Goddard. His defense was that he lost control and reason and acted out of the heat of passion. His comment to his parole officer that he "lost it" supported this theory. Petitioner's comments to his parole officer could not have had a "substantial and

13

injurious effect or influence" on the jury's verdict, *Brecht v. Abrahamson*, 507 U.S. 619, 623 (1993) (quoting *Kotteakos v. United States*, 328 U.S. 750, 776 (1946)), because Jaynne Reagor's testimony provided overwhelming evidence that Petitioner killed Ms. Goddard and that he intended to do so.

### C.  Use of Leg Restraints

The fourth habeas claim alleges that Petitioner was denied a fair trial because he was required to appear before the jury in manacles and leg shackles, although he did not have a history of escape or violence.  Petitioner contends that shackles symbolize guilt and that the presumption of innocence was destroyed when he was forced to appear before the jury in manacles and leg shackles.

Respondent contends that this claim is procedurally defaulted.  The Michigan Court of Appeals stated on review of Petitioner's claim that the claim was not properly preserved for appellate review because defense counsel failed to object at trial.

Petitioner alleged in his state appellate brief that, before trial, he asked to have his leg shackles removed, and the trial court denied his motion.  The Court has not found the motion or any arguments on the motion in the record.  The record does indicate, however, that, on the first day of trial, the court said to a deputy during a discussion in chambers, "Is he wearing chains right now?"  The deputy answered, "No, just the leg brace."  The trial court then addressed Petitioner by saying, "You've got the leg brace on.  So, you can walk.  You'll have a little bit of a limp.  Is that right?"  Petitioner responded, "Yes, sir."  The trial court then suggested that Petitioner walk slowly into the courtroom where the jury was seated so that the jury would not notice the leg restraint and make a prejudicial conclusion about Petitioner's guilt or innocence.

14

(Tr. July 10, 2001, at 35.)

On the second day of trial, defense counsel mentioned to the trial court that Petitioner was wearing handcuffs when the jury came in the back doors and went into the jury room. Defense counsel stated that he was not sure whether the jury saw the handcuffs when they passed through the courtroom. Defense counsel nevertheless objected to the appearance of his client in handcuffs in front of the jury. The trial court responded that he was unable to determine from the way Petitioner was seated whether he was wearing handcuffs, but that the court was willing to separately question the jury about the matter after it reached a verdict. Defense counsel replied, "Very Good." (Tr. July 11, 2001, at 7-8.) The matter was not raised again during the remainder of the trial.

Because the record demonstrates that defense counsel objected at least to the use of handcuffs, the state court mistakenly concluded that Petitioner did not object at trial. Even if Petitioner's claim is procedurally defaulted, "[p]rocedural default is not a jurisdictional bar to review on the merits." *Howard v. Bouchard*, 405 F.3d 459, 476 (6th Cir. 2005). "[F]ederal courts have the power to reach the merits notwithstanding a state procedural default." *Batchelor v. Cupp*, 693 F.2d 859, 863 n.2 (9th Cir. 1982) (citing *Fay v. Noia*, 372 U.S. 391, 438 (1963)). The Court, therefore, will excuse the alleged procedural default and proceed to address the merits of Petitioner's claim.

The Supreme Court stated earlier this year that "the Fifth and Fourteenth Amendments prohibit the use of physical restraints visible to the jury absent a trial court determination, in the exercise of its discretion, that they are justified by a state interest specific to a particular trial."

*Deck v. Missouri*, __ U.S. __, __, 125 S. Ct. 2007, 2012 (2005); *accord Holbrook v. Flynn*, 475 U.S. 560, 568-69 (1986); *Illinois v. Allen*, 397 U.S. 337, 344 (1970). Physical restraints can (1) undermine the presumption of innocence and the related fairness of the factfinding process, (2) interfere with the accused's right to communicate with counsel and participate in his own defense, and (3) frustrate a court's attempt to maintain dignified judicial proceedings. *Deck*, 125 S. Ct. at 2013.

There is no indication in the transcript of trial that the jury was aware of Petitioner's leg brace or handcuffs. Although the negative effects of restraints often will not be shown from a trial transcript, *id.* at 2015, the leg brace apparently was obscured from the jury's view by Petitioner's pant leg, and the trial court stated that the handcuffs were not visible from its point of view. Even defense counsel was unsure whether the jurors saw Petitioner's handcuffs. Furthermore, Petitioner has not alleged that the restraints interfered with his ability to communicate with his attorney or his right to participate in his own defense. His case was not a close one, and the evidence against him was not purely circumstantial. *Cf. Ruimveld v. Birkett*, 404 F.3d 1006, 1017-18 (6th Cir. 2005).

In conclusion, the record does not support Petitioner's allegation that he appeared before the jury in manacles and shackles. Therefore, the state court's denial of relief was not contrary to, or an unreasonable application of, Supreme Court precedent. Petitioner has no right to relief on the basis of his fourth claim.

### D.  The Prosecutor's Conduct

The fifth habeas claim alleges that the prosecutor's repeated misconduct deprived Petitioner of his right to a fair trial. The alleged misconduct consisted of (1) stating during the

16

opening statement that (a) parole agent Mary Lou Anderson visited Petitioner in jail and (b) Marc Mitchell McCarty shared a jail cell with Petitioner and (2) asking Andrea Pankin on direct examination whether Petitioner had any contact with his and Denise Goddard's child.  Petitioner contends that his parole status, incarceration, and failure to visit his minor child were irrelevant issues, which could have inflamed the passions of the jury and resulted in unfair prejudice.

Respondent argues that this claim is procedurally defaulted.  A procedural default is "a critical failure to comply with state procedural law. . . ."  *Trest v. Cain*, 522 U.S. 87, 89 (1997). The doctrine of procedural default provides that a claim is procedurally defaulted and may not be considered by the federal court on habeas review "when a habeas petitioner fails to obtain consideration of a claim by a state court . . . due to a state procedural rule that prevents the state courts from reaching the merits of the petitioner's claim  . . . ."  *Seymour v. Walker,* 224 F.3d 542, 549-50 (6th Cir. 2000).  A petitioner's constitutional claim is procedurally defaulted and barred from habeas review when (1) there is an applicable state procedural rule and the petitioner failed to comply with that rule, (2) the state courts actually enforced the state procedural rule, and (3) the procedural rule was an adequate and independent ground on which the state could rely to foreclose review of a federal constitutional claim.  *Maupin v. Smith*, 785 F.2d 135, 138 (6th Cir. 1986).  If these three conditions are satisfied, a federal habeas court may consider the merits of the petitioner's claims only if the petitioner demonstrates "cause for the default and actual prejudice as a result of the alleged violation of federal law" or "that failure to consider the claims will result in a fundamental miscarriage of justice."  *Coleman v. Thompson*, 501 U.S. 722, 750 (1991).

### 1.  The Rule and Violation of the Rule

Michigan has a contemporaneous-objection rule, *Lancaster v. Adams*, 324 F.3d 423, 437 (6th Cir.), *cert. denied*, 540 U.S. 1004 (2003), which provides that "[a]ppellate review of allegedly improper conduct by the prosecutor is precluded where the defendant fails to timely and specifically object. . . ."  *People v. Schutte*, 240 Mich. App. 713, 721-22; 613 N.W.2d 370, 377 (2000).  This rule applies here.

Petitioner violated the rule by not objecting to the prosecutor's question about whether Petitioner ever visited his child.  (Tr. July 11, 2001, at 50.)  He also failed to object to the prosecutor's opening remarks about Mary Lou Anderson's and Marc McCarty's expected testimony.  (*Id*. at 36.)  He did try to suppress Mary Lou Anderson's testimony, but on the ground that she elicited a statement from him without first giving him *Miranda* warnings.  And he tried to prevent Marc McCarty from testifying on the ground that he did not have adequate notice that McCarty would be a witness.   At no point did he object to the prosecutor's opening statement on the basis that the references to him being on parole or in prison were prejudicial.

### 2.  Enforcement of the Rule;
### Adequate and Independent State Ground for the Rule

Michigan courts enforce the State's contemporaneous-objection rule.  *Lancaster,* 324 F.3d at 437.  It was enforced by the Michigan Court of Appeals, which stated that its review of Petitioner's claim was limited to plain error affecting Petitioner's substantial rights because Petitioner did not object to the alleged misconduct.  Plain-error review by a state appellate court constitutes enforcement of a state's contemporaneous-objection rule.  *Williams v. Bagley*, 380 F.3d 932, 968 (6th Cir. 2004), *cert. denied*, __ U.S. __, 125 S. Ct. 1939 (2005).

The contemporaneous-objection rule was an adequate basis for the state court's decision because the rule was in effect at the time of Petitioner's trial.  The rule was an independent basis

18

for the court's decision in that the Michigan Court of Appeals actually relied on the rule, and the Michigan Supreme Court did not set aside the procedural bar and decide Petitioner's claim on the merits.

All three elements of a procedural default have been satisfied:  Petitioner violated a state procedural rule, the last state court to enter a reasoned opinion on the issue enforced the rule, and the rule was an adequate and independent state ground for denying relief.  Consequently, in order for the Court to consider Petitioner's defaulted claim, he must establish (1) cause for his default and actual prejudice as a result of the alleged violation of federal law or (2) that failure to consider the claim will result in a miscarriage of justice.  *Coleman,* 501 U.S. at 750.

### 3.  Cause and Prejudice; Miscarriage of Justice

Petitioner has not offered any argument in support of a finding of "cause and prejudice." The Court therefore deems the "cause and prejudice" argument abandoned.  *Roberts v. Carter*, 337 F.3d 609, 613 (6th Cir. 2003), *cert. denied*, 540 U.S. 1151 (2004).

A petitioner may overcome a procedural default in the absence of  "cause and prejudice" upon a showing of actual innocence.  *Lott v. Coyle*, 261 F.3d 594, 620 (6th Cir. 2001) (citing *Schlup v. Delo*, 513 U.S. 298, 314-15 (1995), and *Herrera v. Collins*, 506 U.S. 390, 417 (1993)). The miscarriage-of-justice exception applies in the extraordinary case where the habeas petitioner demonstrates that the alleged constitutional error probably resulted in the conviction of one who is actually innocent of the underlying offense.  *Dretke v. Haley*, 541 U.S. 386, 388 (2004); *Murray v. Carrier*, 477 U.S. 478, 496 (1986).

"'[A]ctual innocence' means factual innocence, not mere legal insufficiency." *Bousley v. United States*, 523 U.S. 614, 623 (1998).  "To be credible, [a claim of actual innocence] requires

19

[the] petitioner to support his allegations of constitutional error with new reliable evidence--whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence--that was not presented at trial." *Schlup*, 513 U.S. at 324. "[T]he petitioner must show that it is more likely than not that no reasonable juror would have convicted him in the light of the new evidence." *Id*. at 327.

Although Petitioner maintains that the evidence was legally insufficient to sustain his convictions, he does not deny that he committed the offenses, and he has not submitted any new evidence that might lead a reasonable juror to conclude he was not guilty. Consequently, a miscarriage of justice will not occur as a result of this Court's failure to adjudicate the substantive merits of Petitioner's fifth claim concerning the prosecutor's alleged misconduct. That claim is procedurally defaulted.

### E.  Cumulative Effect

The sixth and final claim alleges that the cumulative effect of the errors at trial rendered the proceeding fundamentally unfair. The Michigan Court of Appeals resolved this claim by stating that the cumulative-error doctrine was inapplicable because it "found no errors of consequence, which combined to deprive defendant of a fair trial."

"[T]he Supreme Court has not held that distinct constitutional claims can be cumulated to grant habeas relief." *Lorraine v. Coyle*, 291 F.3d 416, 447 (6th Cir.), *opinion corrected on denial of reh'g*, 307 F.3d 459 (2002), *and cert denied*, 538 U.S. 947 (2003); *see also Moore v. Parker*, __ F.3d __, __, No. 03-6105, slip op. at 6 (6th Cir. Oct. 4, 2005) (stating that constitutional errors that would not individually support habeas relief cannot be cumulated to support habeas relief). Therefore, it cannot be said that the state court's judgment was contrary

20

to any Supreme Court decision so as to warrant habeas relief under 28 U.S.C. § 2254(d).

*Lorraine*, 291 F.3d at 447.

## IV.  Conclusion

Petitioner's claims either lack merit or are procedurally defaulted.  Accordingly, the petition for a writ of habeas corpus [Doc. #1, May 26, 2004] is DENIED.

The Court DECLINES to grant a certificate of appealability on claims I-IV and VI because reasonable jurists would not find the district court's assessment of the constitutional claims debatable or wrong.  *Slack v. McDaniel*, 529 U.S. 473, 484 (2000).  A certificate of appealability may not issue on claim V because reasonable jurists would not find it debatable whether the petition states a valid claim of the denial of a constitutional right or whether the Court's procedural ruling was correct.  *Id*.  Petitioner, nevertheless, may apply to the Court of Appeals for a certificate of appealability.  Fed. R. App. P. 22(b).

s/Paul D. Borman
PAUL D. BORMAN
UNITED STATES DISTRICT JUDGE

Dated: December 29, 2005
CERTIFICATE OF SERVICE
Copies of this Order were served on the attorneys of record by electronic means or U.S. Mail on December 29, 2005

s/Jonie Parker
Case Manager